UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LONDALE HAYNESWORTH,

    Plaintiff,

    v.

NANCY A. BERRYHILL,[1]

    Defendant.

Case No. 16-cv-04006-JCS

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Plaintiff Londale Haynesworth moves for summary judgment seeking judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his application for disability benefits under Title XVI of the Social Security Act. Haynesworth requests the Court reverse the Commissioner's denial of benefits and remand for an award of benefits. In the alternative, Haynesworth requests the Court remand the matter for further administrative proceedings. The Commissioner filed a cross-motion for summary judgment and requests the Court affirm the denial of benefits to Haynesworth. In the alternative, the Commissioner requests the Court remand for further administrative proceedings if the Court grants Haynesworth's motion for summary judgment. For the reasons articulated below, the Court GRANTS Haynesworth's motion for summary judgment, DENIES the Commissioner's cross-motion for summary judgment, reverses the decision of the Commissioner, and remands the matter with instructions to award benefits.

---

[1] Nancy Berryhill became the Acting Commissioner of Social Security on January 23, 2017, and is therefore substituted for Carolyn W. Colvin as the Defendant in this action. See 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

## II.     BACKGROUND

### A.      Procedural History

On June 7, 2010, Haynesworth filed a Title XVI application for Supplemental Security Income, alleging disability beginning on August 2, 2007.  Administrative Record ("AR," dkt. 19) at 90 (administrative law judge's decision summarizing the procedural history of Haynesworth's application).  The Social Security Administration denied Haynesworth's claim on December 29, 2010, and again on reconsideration on on March 18, 2011.  *Id.*  On May 25, 2011, Haynesworth filed a written request for a hearing before an administrative law judge ("ALJ").  *Id.*  A hearing was held on March 13, 2012, but did not proceed because Haynesworth requested a continuance in order to obtain representation, which ALJ John J. Flanagan granted.  *Id.*  At that time, ALJ Flanagan requested Haynesworth update his medical record because there was no evidence of treatment since 2010 in the record at that time.  *Id.*

A second hearing was held on October 25, 2012, and additional treating medical evidence was presented and entered into the record.  *Id.*  Haynesworth and Jose L. Chaparro, an impartial vocational expert, testified at that hearing.  *Id.*  Haynesworth was represented by Ethel M. Prevost, his grandmother, whom he lives with, and who is not an attorney.  *Id.*  ALJ Flanagan issued a decision on December 14, 2012, finding Haynesworth not disabled under section 1614(a)(3)(A) of the Social Security Act.  *Id.* at 99.  Haynesworth did not appeal that decision.  *Id.* at 20.

On May 31, 2013, Haynesworth filed a second Title XVI application for Supplemental Security Income, alleging disability beginning on March 1, 2013 caused by anxiety and depression.  *Id.* at 20.  The claim was initially denied on September 3, 2013, and denied again on reconsideration on November 18, 2013.  *Id.*  Haynesworth filed a written request for a hearing on December 6, 2013, which was held on November 24, 2014 before ALJ Nancy Lisewski.  *Id.*  Haynesworth testified and was represented by Heather Freinkel, an attorney with the Homeless Action Center.  *Id.*  ALJ Lisewski issued an unfavorable decision on January 21, 2015.  *Id.* at 17–30.  The Social Security Administration Appeals Council considered and denied Haynesworth's request for review on May 17, 2016, finding "no reason under [its] rules to review the Administrative Law Judge's decision."  *Id.* at 1.

2

Haynesworth filed the present action on July 15, 2016, pursuant to 42 U.S.C. § 405(g), which gives the Court jurisdiction to review the Commissioner's final decision. Compl. (dkt. 1). This action was reassigned to the undersigned magistrate judge on September 8, 2016.[2] Pursuant to Civil Local Rule 16-5, Haynesworth filed a motion for summary judgment and the Commissioner filed a cross-motion for summary judgment. *See* Pl.'s Mot. (dkt. 20); Comm'r's Mot. (dkt. 23).

### B. Legal Background

#### 1. Social Security Benefits Available to Disabled Claimants

A disabled claimant may qualify for Supplemental Security Income ("SSI") benefits if the claimant has limited income and owns less than $2,000 in "resources," not counting the claimant's primary home and certain other assets. 42 U.S.C. § 1382(a). Regardless of a claimant's disability onset date, SSI benefits are payable only for months following the month in which the claimant filed his application for SSI benefits. 20 C.F.R. § 416.335.

#### 2. Review of the Commissioner's Final Decisions

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further hearings. 42 U.S.C. § 405(g). When reviewing the Commissioner's decision, district courts must take as conclusive any of the Commissioner's factual findings that are supported by "substantial evidence." *Id.* However, even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if the Commissioner did not apply proper legal standards in weighing the evidence and reaching a decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978). If a reviewing court identifies defects in the administrative proceeding or the Commissioner's conclusions, it may remand for further proceedings or for a calculation of benefits. *See Garrison v. Colvin*, 759 F.3d 995, 1019−21 (9th Cir. 2014).

_____

[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

### 3.     Five-Step Framework for Determining General Disability

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if his physical or mental impairments are of such severity that he is not only unable to do his previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner has established a sequential five-part evaluation process to determine whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a). If the Commissioner concludes that the claimant is or is not disabled at one of the steps, the Commissioner does not proceed to the next step. 20 C.F.R. § 404.1520(a)(4). Otherwise, the evaluation proceeds to the next step. *Id*. The claimant bears the burden of proving Steps One through Four. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). At Step Five, the burden shifts to the Commissioner to prove that the claimant can perform other work. *See Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995).

At Step One, the Commissioner considers the claimant's work history. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is doing "substantially gainful activity," the claimant is not disabled and the evaluation ends. *Id*. If the claimant is not doing "substantially gainful activity," the evaluation proceeds to Step Two. 20 C.F.R. § 404.1520(a)(4).

At Step Two, the Commissioner considers whether the claimant has a "severe medically determinable physical or mental impairment" or combination of such impairments that has lasted or is expected to last more than 12 months. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "[T]he step two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153–54 (1987)). "A claim may be denied at step two only if the

evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental ability(ies) to perform basic work activities." Social Security Ruling 85-28. If medical evidence does not clearly establish such a finding, the evaluation proceeds to Step Three. 20 C.F.R. § 404.1520(a)(4).

At Step Three, the Commissioner compares the claimant's impairment(s) with a list of impairments that the Commissioner has determined are disabling ("Appendix 1"). 20 C.F.R. § 404.1520(a)(4)(iii). If the impairment or combination of impairments "meets or equals" in severity an item on the list and meets the duration requirement, the claimant is disabled. *Id*. Otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(a)(4).

At Step Four, the Commissioner considers the claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4)(iv). A claimant's residual functional capacity is the most the claimant can do in light of the physical and/or mental limitations caused by the impairment(s). 20 C.F.R. § 404.1545. If the claimant can perform his or her past relevant work, the claimant is not disabled. *Id*. Past relevant work is work that the claimant has done in the fifteen months prior to the evaluation and was substantial gainful activity that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant cannot perform his or her past relevant work, the evaluation proceeds to Step Five. *See* 20 C.F.R. § 404.1545(a)(5)(ii).

At Step Five, the Commissioner has the burden to demonstrate that the claimant can perform "other work" that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity, age, education, and work experience. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999) (citing 20 C.F.R § 404.1560(b)(3)); 20 C.F.R § 404.1520(a)(4)(v). If the Commissioner finds the claimant can make an adjustment to other work, the claimant is not disabled. *Id*. Otherwise, the claimant is disabled and eligible for disability benefits. 20 C.F.R § 404.1520(a)(4)(v).

### 4. Supplemental Rules for Determining Mental Disability

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at Steps Two

and Three of the five-step process. *See generally* 20 C.F.R. § 404.1520a; *see also Clayton v. Astrue*, No. CIV 09-2282-EFB, 2011 WL 997144, at *3 (E.D. Cal. Mar. 17, 2011) (citing *Maier v. Comm'r of Soc. Sec. Admin.*, 154 F.3d 913 (9th Cir. 1998)). First, the Commissioner must determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(b)(2), (c). Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1. 20 C.F.R. § 404.1520a(d). If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the evaluation proceeds to Step Four of the general disability inquiry. *See* 20 C.F.R. § 404.1520a(d)(3).

Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share certain "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity criteria). *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00. Therefore, any medically determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental impairments—is sufficiently severe to render a claimant disabled if it satisfies the general Paragraph B criteria, which require that the claimant suffers at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. *See id.* A "marked" limitation is one that is "more than moderate but less than extreme" and "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* at 12.00C.

**C.      Haynesworth's History**

**1.      Personal History[3]**

Haynesworth was born on April 16, 1989, in Oakland, California.  AR at 102, 438. According to the medical records, Haynesworth reported that both his parents were substance abusers and had a difficult relationship.  *Id.* at 438.  Haynesworth reported his mother used to beat him when he was around two or three years old.  *Id.* at 295.  At around seven or eight, Haynesworth and his mother moved in with his maternal grandmother in Oakland.  *Id.* at 438.  A couple years later, Haynesworth and his mother moved to Salinas, California.  *Id.*  Haynesworth reported having been bullied and teased due to his appearance and about a year later, Haynesworth and his mother moved back to Oakland.  *Id.*  When he was twelve, Haynesworth's mother became involved with a man who was physically abusive and he reported seeing his mother being beaten and mistreated.  *Id.*  Due to his anxiety and fear, he decided to move to Inglewood, California to live with his father.  *Id.* at 380, 438.  Haynesworth lived with his father from age thirteen to sixteen.  *Id.*  During this time, Haynesworth was left alone majority of the time, which he claimed made him feel abandoned and unloved.  *Id.*  Haynesworth continued to have feelings that people did not like him based on his appearance.  *Id.* at 438–39.  Haynesworth also reportedly joined a gang and was involved in criminal activities, but was never arrested.  *Id.* at 380, 439.

When he was fifteen, Haynesworth attempted suicide due to his reported depression and anxiety.  *Id.* at 348, 439.  Haynesworth was briefly hospitalized, but did not receive supportive services following discharge and reported his symptoms worsened.  *Id.* at 439.  A year later, Haynesworth moved back to Oakland to live with his mother, her boyfriend, and his younger siblings.  *Id.*  Haynesworth reported he continued to suffer emotionally and dropped out of school. *Id.*  At age seventeen, Haynesworth was hospitalized again for suicidal ideation and depression. *Id.*  He was given therapy and medication and released after one week.  *Id.*  Haynesworth then moved in with his grandmother.  *Id.*  While living with his grandmother, Haynesworth exhibited angry outbursts and uncontrollable temper tantrums, including punching holes in the walls,

---

[3] This summary of Haynesworth's personal history is based on medical records, opinions, and Haynesworth's testimony.

destroying property, and inflicting harm upon himself. *Id.* at 427–31, 439. Haynesworth was hospitalized at age eighteen and again at age twenty-one at John George Pavilion for violent outbursts and cutting behavior. *Id.*

After dropping out of high school, Haynesworth obtained his GED. *Id.* at 349, 439–40. Haynesworth enrolled at a vocational college, but dropped out after a few days. *Id.*

When Haynesworth was eighteen, he enrolled in the Conservation Corps and twice was employed a landscaper. *Id.* at 439. However, Haynesworth quit both times because of his depression and the feeling that people were making fun of him. *Id.* Neither job lasted more than two months. *Id.*

Haynesworth reported that, around 2012, he began choking himself until he passed out in "an attempt to end his suffering for the moment." *Id.* Haynesworth reported this behavior continued through at least October 2014, when he reportedly he choked himself after hearing his father had molested his younger sister when she had lived with him. *Id.* Haynesworth reported he would kill his father if he had the chance. *Id.* Haynesworth also stated that he was the victim of a sexual and physical assault in October 2014. *Id.* at 440.

### 2. Medical History Before 2012 Administrative Hearing

#### a. Pathways to Wellness

Haynesworth was seen at Pathways to Wellness on at least ten separate occasions. AR at 294–318 (March 12, 2008; March 20, 2008; April 10, 2008; May 8, 2008; June 5, 2008; August 4, 2008; September 30, 2008; February 17, 2009; June 9, 2009; and December 18, 2009). Over the course of his treatment at Pathways to Wellness, as detailed below, Haynesworth was prescribed Zypreza and Effexor to treat his diagnosed Major Depressive Disorder and Schizoaffective Disorder. *Id.* at 318.

On March 12, 2008, Haynesworth had his initial evaluation, reporting symptoms of depression. *Id.* at 294. At the time of the evaluation, Haynesworth was not taking any psychotropic mediation. *Id.* at 295. Haynesworth denied any drug or alcohol use within ninety days of the evaluation, but claimed he had used alcohol and marijuana in the past. *Id.* at 296. Additionally, Haynesworth denied any violent behavior within the past ninety days, but admitted

to property damage in the past. *Id.* Haynesworth's treating doctor found he had mild to moderate functional limitations. *Id.* at 298. Haynesworth was diagnosed with Major Depressive Disorder, anxiety, and psychiatric hallucinations. *Id.* at 298–99. Additionally, his physician noted Haynesworth exhibited difficulties in education, employment, and daily and social activities. *Id.* Haynesworth was instructed to return in one week and see a family therapist. *Id.* at 298.

Haynesworth's next appointment was on March 20, 2008. *Id.* at 316. The physician noted Haynesworth had been punching holes in the walls. *Id.* Additionally, Haynesworth was noted as going to Sausal Creek Clinic, where he was prescribed Zyprexa. *Id.* The physician found his prognosis fair, requested he return in three weeks, and instructed Haynesworth to continue taking Zyprexa. *Id.* at 317–18. On February 17, 2009, the physician noted Haynesworth had been using alcohol and had stopped taking his medication, and referred him to alcohol rehabilitation. *Id.* at 304–05. On June 9, 2009, Haynesworth was diagnosed with Schizoaffective Disorder and alcohol dependence. *Id.* at 302–03. Haynesworth returned to Pathways to Wellness on December 18, 2009, to obtain additional medication. *Id.* at 300–02. Haynesworth reported feeling isolated and angry and wanted "something" for his depression. *Id.* at 300. The physician prescribed Haynesworth medication and requested monthly medication management visits. *Id.* There are no records indicating Haynesworth was treated at Pathways to Wellness after the December 2009 appointment.

### b.   John George Psychiatric Pavilion

Haynesworth was treated at the Alameda County Medical Center, John George Psychiatric Pavilion on July 23, 2007, and on May 23, 2010. *Id.* at 319–32. Haynesworth was admitted on June 23, 2007 voluntarily after his mother called 911 because he was aggressive, angry, and had punched a hole in the wall. *Id.* at 325. Haynesworth's mother reported he had been off his medication for about three weeks. *Id.* An intake evaluation form from that visit states that Haynesworth had a history of depression and aggressive behavior directed towards property, as well as an attempted suicide at fifteen years old. *Id.* Haynesworth denied any drug or alcohol use, but his mother insisted he had been using marijuana. *Id.*

Haynesworth was seen again on May 23, 2010, after being transferred from Alta Bates. *Id.*

at 319. Haynesworth's records indicate he lost his job at Taco Bell two months prior after a syncopal episode (fainting). *Id.* Haynesworth's records also stated he had a "near syncopal episode today when talking to [the] police." *Id.* Haynesworth reported losing his medical insurance over a month prior, had not been on medication since, and had worsening auditory hallucinations, paranoia, anhedonia, isolativeness, and decreased appetite. *Id.* The intake evaluation report indicated Haynesworth was a danger to himself, with reports—of unknown origin and denied by Haynesworth—that Haynesworth had threatened to slit his throat. *Id.* at 319. Haynesworth was prescribed Zyprexa. *Id.* at 321.

### c. Dr. James R. Liles of Schuman-Liles Clinic

Haynesworth was first evaluated by Dr. James R. Liles of the Schuman-Liles Clinic on July 25, 2012. *Id.* at 348. At the appointment, Haynesworth was accompanied by his mother. *Id.* Dr. Liles' report stated Haynesworth had a seven year history of decompensating into psychosis, with depression, sociality, hallucinations, and mood instability. *Id.* at 351. Dr. Liles also noted that Haynesworth was not in regular treatment due to lack of money. *Id.* Haynesworth was diagnosed with Schizoaffective Disorder. *Id.*

Haynesworth was again seen on August 29, 2012,[4] this time accompanied by his grandmother. *Id.* at 343. Dr. Liles' report described an episode in which Haynesworth awoke to find some money missing, which caused him to become enraged, punch a wall, and cut himself. *Id.* Haynesworth spent most days playing video games. *Id.* Haynesworth reported that he hated himself. *Id.* Dr. Liles noted Haynesworth was averse to some medical treatments and was difficult to treat because he was in denial. *Id.* at 345.

Haynesworth received additional treatment on October 23, 2012. *Id.* at 338. Dr. Liles noted Haynesworth was vastly improved and had no episodes of acting out, although he "remain[ed] greatly challenged." *Id.* at 338–39. According to Dr. Liles, Haynesworth was taking BART and spending time with friends, and had "met some girls but no dates yet." *Id.* At this

---

[4] The record is not entirely clear as to whether this visit occurred on August 28 or 29, 2012. A "Psychiatric Medication Progress Note" lists the "Date of Service" as "08-29-2012," but that same report and subsequent reports include entries dated "8-28-12" that appear to refer to the same visit. AR at 343; *see id.* at 334, 339.

time, Haynesworth was on five different medications.  *Id.* at 339.

### 3.  2010 Disability Application and October 2012 Administrative Hearing

On June 7, 2010, Haynesworth filed an application for supplemental security income, alleging disability beginning August 2, 2007.  *Id.* at 90.  A hearing was held by ALJ John Flanagan on October 25, 2012, where Haynesworth appeared and testified, along with Jose L. Chaparro, an impartial vocational expert.  *Id.*

### a.  Haynesworth's Testimony

ALJ Flanagan began the hearing by addressing Haynesworth's lack of representation, to which Haynesworth responded by appointing his grandmother, who is not an attorney, which is permitted under 20 C.F.R § 404.1705.  *Id.* at 50–53.  Haynesworth answered questions about his personal background.  *Id.* at 60.  Haynesworth testified he has had difficulty talking with people his whole life.  *Id.* at 60–61.  Haynesworth testified he attended school in Inglewood, California, but dropped out at tenth grade because he does not like to be around people.  *Id.* at 61. Haynesworth also described his prior employment positions at the Conservation Corps, which also ended because of his dislike for being around people.  *Id.*  Haynesworth said his anxiety was manageable during the job-training program; however, once integrated with a landscaping crew, it was difficult for him to be around his coworkers.  *Id.* at 73.  Additionally, in 2010 he worked at a Taco Bell restaurant for two days, but on his second day at work he fainted and did not return.  *Id.* at 62–65.  Haynesworth claimed to have been clean and sober for the past two months at the time of the hearing.  *Id.* at 64.

Haynesworth testified about his treatment at various facilities for schizoaffective disorder, depression, and psychotic disorder.  *Id.* at 63.  Haynesworth had been prescribed various medications to treat these conditions, all of which he claimed to still be taking.  *Id.* at 65. Haynesworth claimed his mental conditions had remained constant, or at certain times worsened, since June of 2010.  *Id.* at 69–70.  Haynesworth agreed with the ALJ's characterization of medical opinions that when his medication runs out, his mental condition deteriorates and he begins hearing voices and thinking people are talking about him.  *Id.* at 73.  Haynesworth testified that when taking his medication, his condition deteriorated more slowly, but he still experienced

symptoms.  *Id.*  Haynesworth and his grandmother also added that "every few months" Haynesworth got so anxious or angry that he harmed himself.  *Id.* at 74–75.

Haynesworth testified that the main problem for why he was unable to work was because he disliked being around people, was unable concentrate on certain things for long periods of time, and had episodes of depression and anxiety which made him nonfunctional.  *Id.* at 68.  These nonfunctional episodes happened every few months and lasted "a couple weeks."  *Id.* at 68–69.  He had not attempted to work since 2010 because he felt hopeless about working.  *Id.* at 72.

During a typical day, Haynesworth testified he spent as much time as possible in the house, only associating with his family members.  *Id.* at 70–71.  Outside of his family, he had one friend, whom he had known since he was young, that he associated with.  *Id.* at 71–72.

### b.    Vocational Expert Jose L. Shapparo's Testimony

ALJ Flanagan then called vocational expert Jose L. Shapparo (the "VE") to testify at the hearing.  *Id.* at 76–84.  The VE responded to a series of hypotheticals.  *Id.*

In the first hypothetical, ALJ Flanagan asked the VE to consider an individual of Haynesworth's age, education, and work experience who has no exertional limitations, but is restricted to simple, repetitive tasks.  *Id.* at 77–78.  In addition, that individual would need to have little contact with others, limited to around one-third of the workday, and perform low-stress work.  *Id.*  The VE determined that based on the hypothetical circumstances, that individual could work as a commercial or institutional cleaner, which is heavy work and unskilled with a Specific Vocational Preparation ("SVP") of two.  *Id.* at 79.  The VE also found that individual could perform work as a "cleaner II," which is medium work and unskilled with an SVP of one.  *Id.*  Finally, the VE found that individual could perform work as a housecleaner, which is heavy and unskilled with an SVP of two.  *Id.* at 79–80.

In the second hypothetical, ALJ Flanagan kept the same limitations as the first hypothetical individual, but modified the ability to interact with other coworkers to moderately restricted, meaning that an individual had difficulty in doing so but could still perform that function.  *Id.* at 80.  These new terms did not change the VE's responses regarding occupations.  *Id.*

In the third hypothetical, ALJ Flanagan kept the same limitations as the first hypothetical

individual, but modified the difficulty interacting with other coworkers to marked, meaning at times that the individual would be unable to interact with others depending on his mental and emotional state on a particular day. *Id.* at 81. Under these terms, the VE found there to be no work an individual with those limitations could perform. *Id.*

Haynesworth's grandmother also asked the VE about an individual who was on medication that slowed his responsiveness, which the ALJ construed as adding a limitation to someone whose condition was otherwise consistent with the first hypothetical. *Id.* at 81–82. The VE testified that if the person worked at a slower pace than the norm, he would be precluded from unskilled work. *Id.* In addition, Haynesworth's grandmother asked the VE about an individual who faced difficulty getting to work because he was not able to use public transportation due to psychological implications of exposure to crowds. *Id.* at 83. Before the VE answered, ALJ Flanagan took administrative notice that if the individual could not get to work, he also could not work. *Id.*

### c. ALJ Flanagan's Five-Step Analysis

#### i. Step 1: Substantial Gainful Activity

ALJ Flanagan began his analysis by finding Haynesworth had not engaged in substantial gainful activity since filing his application on June 7, 2010. *Id.* at 92. Haynesworth had participated in short job-training programs in 2007 and 2010, but "earnings from these programs were below the level necessary to constitute gainful activity." *Id.*

#### ii. Step 2: Severe Impairments

ALJ Flanagan identified schizoaffective disorder as Haynesworth's only sever impairment. *Id.* Haynesworth's schizoaffective disorder was "more than minimally restrict[ing] the claimant from performing basic mental work-related functions." *Id.* ALJ Flanagan found no allegations or evidence that Haynesworth suffered from any physical problems. *Id.*

#### iii. Step 3: Medical Severity

ALJ Flanagan found that Haynesworth did "not have an impairment or combination of impairments that meets or medical equals the severity of one of the listed impairments." *Id.* at 93. In reaching that conclusion, ALJ Flanagan considered the criteria of listing 12.03

13

(schizophrenic, paranoid, and other psychotic disorders). *Id.* at 93. ALJ Flanagan found

Haynesworth did not meet the "paragraph B" or "paragraph C" criteria for the listing. *Id.* at 93.

"Paragraph B" is satisfied by a showing of mental impairment in at least two of the following:

marked restriction of activities of daily living; marked difficulties in maintaining social

functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated

episodes of decompensation, each of extended duration. *Id.* ALJ Flanagan found Haynesworth's

medical records indicated he suffered from mild to moderate levels of limitation relative to

activities of daily living, maintaining social functioning, and maintaining concentration. *Id.*

According to ALJ Flanagan, if Haynesworth consistently took his medications, his level of

limitation in the aforementioned areas would be only mild. *Id.* Finally, ALJ Flanagan concluded

Haynesworth did not experience any episodes of decompensation for any extended duration. *Id.*

ALJ Flanagan relied on the findings and opinions of two state agency psychologists, who found

Haynesworth only suffered from moderate functional difficulties. *Id.* ALJ Flanagan also found

the "paragraph C" criteria for listing section 12.03—documented history of a chronic psychotic

disorder of at least two years—not satisfied by the evidence in the record. *Id.* at 94. Based on the

aforementioned, ALJ Flanagan found Haynesworth did not meet or equal the criteria of listing

section 12.03. *Id.*

### iv. Step 4: Residual Functional Capacity

ALJ Flanagan determined Haynesworth had "the physical residual functional capacity to

perform a full range of work at all exertional levels, including sustained very heavy work

activity." *Id.* at 94. As for Haynesworth's mental residual functional capacity, ALJ Flanagan

found that he would be restricted to only simple repetitive tasks, in a low stress work environment,

with little contact with others. *Id.*

ALJ Flanagan considered all of Haynesworth's symptoms and based his conclusion on a

two-step process: (1) whether there was an underlying medically determinable physical or mental

impairment(s) that could reasonably be expected to produce Haynesworth's pain or other

symptoms and (2) the extent to which the intensity, persistence, and effects of said symptoms limit

Haynesworth's functioning. *Id.* at 94–95. ALJ Flanagan relied on the findings and opinions of

14

two state agency psychologists, Drs. Smith and Tasjian, but found Dr. Liles' assessment entitled to no evidentiary weight. *Id.* at 97. ALJ Flanagan found Haynesworth's medically determinable impairment was reasonably expected to cause the associated symptoms. *Id.* However, ALJ Flanagan found Haynesworth's statements regarding the intensity, persistence, and limiting effects of his symptoms not credible to the extent the statements were inconsistent with the residual functional capacity assessment. *Id.* This was because ALJ Flanagan found these statements were not supported by medical evidence, Haynesworth's testimony, and other statements of the record. *Id.* ALJ Flanagan did not find good cause or valid reason for Haynesworth's lack of regular mental health treatment. *Id.* ALJ Flanagan mentioned various clinics where Haynesworth could obtain free medical and psychiatric care. *Id.* at 97–98.

### v. Step 5: Ability to Perform Other Jobs in the National Economy

ALJ Flanagan found, based on testimony from VE Chaparro and medical records, that there were jobs in the national economy that Haynesworth could perform. *Id.* at 98–99. Therefore, ALJ Flanagan concluded Haynesworth was capable of making a successful adjustment to other work in the national economy and thus, a finding of "not disabled" was appropriate. *Id.* Haynesworth did not appeal the decision. *Id.* at 20.

### 4. Medical History Following October 2012 Administrative Hearing

### a. Subsequent Visits with Dr. Liles

After the 2012 hearing, Haynesworth visited the Schuman-Liles clinic again on November 21, 2012, and reported he was "hanging out with friends, going out to a couple bars . . . met a girl, and is dating someone right now." *Id.* at 333. Dr. Liles urged Haynesworth to find work, but reported Haynesworth still suffered from major challenges with anxiety and depression. *Id.* at 333–34. Given Haynesworth's extant mental disorder, Dr. Liles recommended he return in one month. *Id.* at 337.

Haynesworth returned to Dr. Liles on December 5, 2013, accompanied by his grandmother. *Id.* at 427. Haynesworth told Dr. Liles that he "is not happy with himself, that he has no friends, that he is the Bad Seed." *Id.* at 429. Haynesworth also said he attempted to choke

himself "'just to pass out, be out of it.'"  *Id.*  His mental status examination was within normal limits.  *Id.*

Dr. Liles saw Haynesworth again on March 21, 2014.  *Id.* at 422.  Haynesworth reported he obtained Medi-Cal coverage and thus would be able to afford treatment and more medication.  *Id.* at 424.  Haynesworth stated he did not feel well and had been off his medication per instructions from the emergency room following a seizure on March 3, 2014.  *Id.*  Following the seizure, Haynesworth had a CT scan, which was negative.  *Id.*  Haynesworth's mental status examination was within normal limits in all categories.  *Id.* at 424–25.

Haynesworth was seen by Dr. Liles on June 20, 2014, reporting "anger, irritability, low stress tolerance, and was paranoid and out of control: he threw his phone; [his] mother called the police but he wasn't taken in."  *Id.* at 418.  Haynesworth reported auditory hallucinations of "evilness" telling him to do bad things, as well as thoughts of wishing his neighbors were killed, although he denied any homicidal intent.  *Id.*  Haynesworth told Dr. Liles that he was hopeless and would not mind dying.  *Id.*  Dr. Liles' report noted he suspected poor compliance, likely referring to Haynesworth's medication.  *Id.*  The progress note stated that Haynesworth's mother had been using crack when she was pregnant with him, and that Haynesworth had used heroin and crystal meth in the past and continued to use marijuana.  *Id.*  At the time of this visit, Haynesworth was mostly housebound.  *Id.* at 419.  Dr. Liles' report nevertheless lists the results of Haynesworth's mental status examination was within normal limits.  *Id.*

Dr. Liles saw Haynesworth again on September 18, 2014.  *Id.* at 410.  Dr. Liles characterized Haynesworth's adherence to his medication as "good."  *Id.* at 411.  Haynesworth reported he "feel[s] very good now."  *Id.*  Haynesworth informed Dr. Liles that he was "off drugs, using his computer, hanging out with better people, and finding a job."  *Id.* at 412.  Haynesworth's mental status exam was again within normal limits.  *Id.* at 413.

Dr. Liles completed a Mental Impairment Questionnaire (the "Questionnaire") in October of 2014.  *Id.* at 449–51.  Dr. Liles found Haynesworth had functional limitations as a result of his mental impairments.  *Id.*  Specifically, Haynesworth had moderate restrictions on activities of daily living, marked to extreme difficulties in maintaining social functioning, and marked

difficulties in maintaining concentration, persistence, or pace. *Id.* Haynesworth's levels of impairment ranged from fair to extreme. *Id.* at 450. Additionally, Dr. Liles found Haynesworth would miss more than four days per month of work due to his impairments or treatment. *Id.* at 449. Dr. Liles stated that his determination of the severity of Haynesworth's symptoms and mental impairments was based on mental status examinations and clinical interviews. *Id.*

### b.      Lesleigh Franklin, Ph.D.

Lesleigh Franklin, Ph.D., performed a psychological evaluation of Haynesworth on August 23, 2013, to determine his then-current cognitive and emotional functioning. *Id.* 379–91. Dr. Franklin specifically performed: a clinical interview; Repeatable Battery for the Assessment of Neuropsychological Status (RBANS); Mini Mental State Examination (MMSE); Trail Making A & B; Clock Test; Miller Forensic Assessment of Symptoms (M-FAST); Minnesota Multiphasic Personality Inventory, 2nd Edition, Restructured Format (MMPI-2 RF); and review of Dr. Liles and John George Pavilion medical records. *Id.* at 379.

Haynesworth showed "adequate language abilities" and placed in the average range at the fifty-third percentile. *Id.* Haynesworth scored in the low average range for visuospatial and constructional abilities, though Dr. Franklin noted this finding should be interpreted with caution due to the variability between the subtest performances. *Id.* at 384–85. Haynesworth's performance on the memory portion was "generally poor." *Id.* at 385. In addition, Haynesworth also showed difficulty on the attention and concentration portion. *Id.* Haynesworth's score put him below the third percentile and far below the average range. *Id.* at 386. Dr. Franklin found Haynesworth had "moderately impaired executive functioning" and was "especially challenged by activities where time is of the essence." *Id.* at 385–86. Haynesworth struggled with immediate memory tasks and attention. *Id.* at 386.

Haynesworth's emotional functioning was tested using the MMPI-2 RF and M-FAST. *Id.* 386–88. The MMPI-2 RF is "an objective test of psychological functioning utilized to gather information about symptoms, affect regulations, interpersonal relationships, and self perception." *Id.* at 386. The M-FAST is "a measure utilized to determine if a client is prone to overstate or exaggerate symptoms." *Id.* Haynesworth's MMPI-2 RF scores were within normal limits, and he

"did not demonstrate a tendency to overstate or understate his problems," though did "demonstrate a higher level of debasement then is commonly seen." *Id.* Additionally, Haynesworth's M-FAST score "indicate[d] that he is more distressed then is seen in the general population, but it does not indicate malingering." *Id.*

Overall, Dr. Franklin found Haynesworth was "having the kinds of cognitive difficulties commonly seen in people with mood disorders." *Id.* at 388. Dr. Franklin found Haynesworth's "language skills were within normal limits, but he demonstrated impairments in memory and attention," and exhibited cognitive slowing. *Id.* Dr. Franklin found no evidence Haynesworth was exaggerating his symptoms for personal gain, finding many symptoms validated by psychiatric records and from her observations. *Id.* Dr. Franklin diagnosed Haynesworth with Schizoaffective Disorder (Depresssive Type) and Cannabis Abuse. *Id.* at 388–89. In addition, she also noted he had symptoms of Social Phobia, but did not assign that diagnosis. *Id.* at 389.

Dr. Franklin found Haynesworth's mental limitations were either extreme or marked. *Id.* at 391. Dr. Franklin determined that if Haynesworth was placed in a work situation at that time, he would have "marked trouble remembering simple directions and extreme trouble remembering complex directions," "marked trouble with activities that require sustained mental attention," and "severe trouble interacting appropriately with the public, coworkers, and authorities." *Id.* at 389. Overall, Haynesworth's "cognitive and mental health symptoms would severely interfere with his job performance." *Id.*

### c.    Laura Catlin, Psy.D.

Laura Catlin, Psy.D., performed a psychological disability evaluation on October 21, 2014. *Id.* at 437–48. Dr. Catlin specifically performed: a clinical interview; Wechsler Abbreviated Scale of Intelligence (WASI); Repeatable Batter for the Assessment of Neuropsychological Status (RBANS); Beck Depression Inventory (BDI); Brief Symptom Inventory (BSI); Burns Anxiety Inventory; Burns PTSD Inventory; and a records review. *Id.* at 437, 452.

Along with describing his daily activity, as well as personal and educational history, Haynesworth told Dr. Catlin he heard voices in his head telling him he was "stupid, ugly, and a loser." *Id.* at 438. Haynesworth further indicated he had difficulty being around others and

preferred to be alone.  *Id.*  Dr. Catlin noted Haynesworth had medication compliance problems in the past, but Haynesworth told her he had been compliant with his medication for the past nine months.  *Id.* at 440.  Dr. Catlin also noted Haynesworth's insufficient social insurance and welfare support.  *Id.* at 445.

During the mental status examination, Dr. Catlin found that Haynesworth exhibited a level of arousal within normal limits, had average response time, and was engaged during the evaluation.  *Id.* at 440–41.  Haynesworth reported he was still having delusions that other people were speaking negatively about him.  *Id.* at 441.

Dr. Catlin then performed several tests that measured Haynesworth's cognitive functioning.  *Id.* at 441–45.  Dr. Catlin found Haynesworth had a low average range of intellectual functioning.  *Id.* at 441–42.  Haynesworth's overall score from the RBANS evaluation, which measures immediate and delayed memory, attention, language, and visuospatial skills, was in the extremely low range.  *Id.* at 442–44.  Haynesworth's BDI indicated symptoms of severe depression.  *Id.* at 444.  Additionally, according to Dr. Catlin's findings from the Burns PTSD and Anxiety Inventories, Haynesworth showed signs he was experiencing many symptoms of PTSD, anxiety, and psychological distress.  *Id.* 444–45.

Based on her tests, records review, and in person examination, Dr. Catlin diagnosed Haynesworth with Social Anxiety Disorder, PTSD, Major Depressive Disorder, and Generalized Anxiety Disorder.  *Id.* at 445.  Dr. Catlin found Haynesworth severely impaired in his ability to perform in the workplace.  *Id.* at 447.  Dr. Catlin further found extreme difficulties in maintaining social functioning and performing activities of daily living, as well as marked deficiencies in concentration, persistence, or pace.  *Id.* at 447–48.  Dr. Catlin found Haynesworth had five or more episodes of decompensation within a twelve month period, each lasting over two weeks.  *Id.* at 448.  Finally, Dr. Catlin believed Haynesworth's impairments would result in him being absent from work more than four days a month.  *Id.*

On April 16, 2015, Dr. Catlin wrote a follow up letter stating that her opinion incorporated: (1) Dr. Liles' progress notes from July 25, 2012 through September 8, 2014; (2) Dr. Franklin's August 23, 2013 report; (3) John George Psychiatric Pavilion records from July 23, 2007 through

May 23, 2010; and (4) Pathways to Wellness reports from March 20, 2008 through December 18, 2009. *Id.* at 452. In that letter, Dr. Catlin acknowledged Haynesworth's gap in coverage and poor compliance with medication. *Id.* Dr. Catlin asserted, however, that Haynesworth's medication should have reached its therapeutic levels by the time she interviewed him, and the examination therefore should have accurately reflected his functioning on medication. *Id.*

### d. State Agency Consultants Dr. Lee and Dr. Lucila and Disability Determination Explanation

Dr. Lee, a state agency non-examining consultant, reviewed Haynesworth's medical records and determined he was not disabled on August 30, 2013. *Id.* at 102–16. Dr. Lee found Haynesworth "had mental limitations related to schizoaffective [disorder], depression, and anxiety," but determined he experienced "[v]ast improvement when compliant" with his medication. *Id.* at 109. Dr. Lee also recommended that ALJ Lisewski adopt ALJ Flanagan's earlier decision finding Haynesworth capable of work with simple tasks with limited public contact. *Id.* at 109–10. Dr. Lee further found that Haynesworth's statements about the "intensity, persistence, and functionally limiting effects of the symptoms [were not] substantiated by the objective medical evidence alone." *Id.* at 111. In making this determination, Dr. Lee indicated he relied on "precipitating and aggravating factors," "medication treatment," and "treatment other than medication." *Id.* Based on medical records and testimony from the previous hearing, as well as Dr. Franklin's opinion, Dr. Lee determined Haynesworth was only partially credible, finding evidence of schizoaffective disorder, but based on Haynesworth's medical history, determining that the condition improved with compliance with his medication, and that when he was not compliant, his symptoms were exacerbated. *Id.*

Dr. Lee assessed Haynesworth's residual functional capacity, and found Haynesworth predominately moderately limited with regard to various limiting factors. *Id.* at 126–29. Dr. Lee acknowledged that Dr. Franklin's opinion found Haynesworth more restricted. *Id.* at 129. However, Dr. Lee discredited Dr. Franklin's opinion as relying "heavily on the subjective report of symptoms and limitations provided by [Haynesworth]," and as not supported by other evidence in the record. *Id.* at 114. Based on the residual functioning capacity, Dr. Lee found Haynesworth

capable of work as an addresser, nut sorter, and cuff folder. *Id.* at 115.

Dr. Lucila, another state agency non-examining consultant, also reviewed Haynesworth's medical records and determined he was not disabled on November 18, 2013. *Id.* at 118–131. Dr. Lucila relied on the same materials and made similar conclusions to Dr. Lee. *Id.*

### D. Haynesworth's Present Application and 2014 Administrative Hearing

On May 31, 2013, Haynesworth filed a second Title XVI application for Supplemental Security Income, alleging disability beginning on March 1, 2013 caused by anxiety and depression. *Id.* at 20. ALJ Lisewski issued an unfavorable decision on January 21, 2015. *Id.* at 17–30. Prior to the hearing, Heather Freinkel, Haynesworth's attorney from the Homeless Action Center, submitted a brief to ALJ Lisewski on November 18, 2014. *Id.* at 274–81.

#### 1. Haynesworth's Testimony

ALJ Lisewski only briefly questioned Haynesworth, mainly regarding his age, living location, and why he felt he could not work. *Id.* at 37. Haynesworth testified that he felt he could not work because he is nervous and anxious around people, that he does not feel dependable, and that he is worried about "mess[ing] stuff up." *Id.* Haynesworth's counsel, Freinkel, took over questioning shortly thereafter. *Id.* Freinkel asked Haynesworth about his past work experience, starting with his most recent work at Taco Bell in 2010. *Id.* At Taco Bell, Haynesworth worked the cash register, which he found difficult because of the amount of interactions he had with people. *Id.* On his second day of work, he fainted and an ambulance had to come. *Id.* He never returned to that job. *Id.* Haynesworth also spoke about his work with the Conservation Corps, which he stopped attending because he felt people were making fun of him. *Id.* at 40–41.

Freinkel then questioned Haynesworth about his medical history and recent treatment with Dr. Liles. *Id.* at 41. Haynesworth stated Dr. Liles prescribes him medication, which he takes and which makes him feel a little less anxious. *Id.* However, Haynesworth went on to say he "always feel[s] down and depressed and just with a negative attitude." *Id.* Additionally, even when taking the medication, Haynesworth stated he could not be around people. *Id.* at 42. Haynesworth testified that most days his symptoms leave him unable to go outside of his house. *Id.* Haynesworth said he never stopped taking the medication as prescribed. *Id.*

### 2. Vocational Expert Robert Cottle's Testimony

ALJ Lisewski then called VE Robert Cottle to testify at the hearing. *Id.* at 43–48. ALJ Lisewski asked the VE two hypotheticals. *Id.* For the first hypothetical, ALJ Lisewski asked the VE to consider an individual of Haynesworth's age, education, and work background, limited to "simple, repetitive work in a low-stress environment with no more than occasional social contact." *Id.* at 43. ALJ Lisewski clarified that by low-stress, she meant "work performed at lower competitive levels." *Id.* The VE determined that an individual with those limitations could be an eyedropper assembler or a table worker spotter, both of which have an SVP of two and are sedentary. *Id.* at 44. Additionally, the VE suggested a garment bagger, which has an SVP of one and requires light strength. *Id.* For the second hypothetical, ALJ Lisewski kept the same limitations as the first hypothetical, but the individual would miss about four days of work per month. *Id.* The VE determined there would be no work for an individual like that. *Id.* When asked by Freinkel, the VE explained that a person limited to simple, unskilled work, could only miss about two days per month to be employable. *Id.* at 45.

Freinkel's first hypothetical required the VE to consider an individual of Haynesworth's age, education, and work history, who is limited to simple, repetitive tasks with moderate impairments. *Id.* Moderate impairments in this context mean inability to "perform the task at competitive standards up to 15 percent of the workday." *Id.* at 45–46. Freinkel listed several areas where that individual would be moderately limited. *Id.* at 46. The VE found there were no jobs such a person could perform. *Id.* at 46–47.

In her second hypothetical, Freinkel inquired whether an individual with Haynesworth's age, education and work history, who also had an extreme impairment in social functioning, and a marked impairment in concentration, persistence, and pace, would be able to perform a job. *Id.* at 47–48. The VE did not believe such a person would be employable. *Id.* at 48.

### 3. ALJ Lisewski's Finding of Changed Circumstances

"[A]n ALJ's finding that a claimant is not disabled 'create[s] a presumption that [the claimant] continued to be able to work after that date.'" *Lester v. Chater*, 81 F.3d 821, 827 (9th Cir. 1995) (quoting *Miller v. Heckler*, 770 F.2d 845, 848 (9th Cir. 1985)). Changed circumstances

can be demonstrated by showing worsening of a medical or psychiatric condition, change in age category, a new impairment raised, or lack of representation. *Id.* at 827–828; *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988).

ALJ Lisewski rejected Haynesworth's arguments that he has made a showing of changed circumstances based on an increase in the severity of his mental impairment. *Id.* at 21. ALJ Lisewski did find, however, that Haynesworth made a showing of changed circumstances based on representation by an inexperienced family member at the October 25, 2012 hearing. *Id.* at 23. ALJ Lisewski therefore determined that she had the option to adopt any findings from ALJ Flanagan's prior decision as appropriate. *Id.* at 21. ALJ Lisewski adopted ALJ Flanagan's findings regarding the "residual functional capacity, education, and work experience, or such other findings required at a step in the sequential evaluation process, because"—in her view—"there [was] no new and material evidence relating to such findings proving that those findings should not be adopted." *Id.* at 23.

### 4.   ALJ Lisewski's Five-Step Analysis

#### a.   Step 1: Substantial Gainful Activity

ALJ Lisewski began her analysis by finding Haynesworth had not engaged in substantial gainful activity since filing his application on May 31, 2013. *Id.* at 23. ALJ Lisewski adopted ALJ Flanagan's finding that Haynesworth had never held a regular full-time position. *Id.*

#### b.   Step 2: Severe Impairments

ALJ Lisewski also determined that Haynesworth's sole impairment was schizoaffective disorder. *Id.* at 23. ALJ Lisewski found no mental or physical impairments in the record that were new since ALJ Flanagan's decision. *Id.*

#### c.   Step 3: Medical Severity

ALJ Lisewski concurred with ALJ Flanagan's finding that the severity of Haynesworth's mental impairment did not meet or medically equal the severity of one of the listed impairments. *Id.* Similar to ALJ Flanagan, in reaching this conclusion ALJ Lisewski considered the criteria of listing 12.03. *Id.* ALJ Lisewski found Haynesworth did not satisfy the "paragraph B" or "paragraph C" criteria. *Id.* at 23–24.

ALJ Lisewski found Haynesworth's medical records indicated he suffered from mild to moderate levels of limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. *Id.* at 24. Additionally, ALJ Lisewski concluded that if Haynesworth consistently and properly took his medications, his level of limitation in the aforementioned areas would be mild. *Id.* Further, even if Haynesworth was not taking his medication consistently, ALJ Lisewski determined his "level of limitation ha[d] not been proven to be worse than moderate." *Id.* Finally, ALJ Lisewski concluded Haynesworth did not experience any episodes of decompensation for any extended duration. *Id.* ALJ Lisewski "gave significant evidentiary weight to the findings and opinions of the State agency consultants." *Id.* These consultants "concluded the claimant would have no more than moderate difficulty in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace." *Id.* Additionally, these consultants "opined the claimant's mental disorder did not meet or equal Listing level criteria." *Id.* Based on the consultant opinions' and findings, ALJ Lisewski concluded "there [was] no significant or credible evidence in the record which would contradict or rebut the assessments of these physicians, which [ALJ Lisewski] conclude[d] are entitled to significant evidentiary weight." *Id.* Therefore, Haynesworth's mental impairment did not satisfy the "paragraph B" limitations because there was no evidence of least two marked limitations or one marked limitation and repeated episode of decompensation of an extended duration. *Id.*

ALJ Lisewski also found, without explanation, that the "paragraph C" criteria for listing section 12.03 not satisfied by the evidence in the record. *Id.* Based on the aforementioned, ALJ Flanagan found Haynesworth did not meet or equal the criteria of listing section 12.03. *Id.*

### d.    Step 4: Residual Functional Capacity

ALJ Lisewski determined Haynesworth has a "residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to simple repetitive tasks in a low stress work environment, with no more than occasional social contact." *Id.* at 25.

ALJ Lisewski considered all of Haynesworth's symptoms and the extent to which these

symptoms reasonably could be accepted as consistent with the objective medical evidence. *Id.* at 25. ALJ Lisewski found Haynesworth's medically determinable impairment was reasonably expected to cause the associated symptoms. *Id.* However, ALJ Lisewski found Haynesworth's statements regarding the intensity, persistence, and limiting effects of said symptoms not credible to the extent the statements were inconsistent with the residual functional capacity assessment recounted above. *Id.*

ALJ Lisewski claimed to rely primarily on the medical evidence. *Id.* Additionally, ALJ Lisewski stated that she considered Haynesworth's testimony in light of certain credibility factors as set forth in the regulations. *Id.* at 25–26 (citing 20 C.F.R. § 416.929). ALJ Lisewski adopted ALJ Flanagan's residual functional capacity determination—that Haynesworth was "capable of a wide range of work at all exertional levels, with the same limitations found here"—as "well-reasoned and fully supported." *Id.* at 26. As noted above, ALJ Flanagan's decision was based on his consideration of evidence through October 2012. *Id.* ALJ Flanagan rejected the medical source statement of treating psychiatrist Dr. Liles as not support by the other medical records or Dr. Liles' other treatment notes. *Id.* (citing AR at 96–97). Particularly important was evidence that both ALJ Flanagan and ALJ Lisewski construed as showing that when Haynesworth took his medications as prescribed, there was a vast improvement in his level of functioning. *Id.* ALJ Flanagan found no evidence to explain why Haynesworth failed to attend regular treatment or take his medications as prescribed. *Id.* ALJ Lisewski adopted this because, in her view, even with the additional treatment records and opinions, Haynesworth's overall capacity was not shown to have worsened. *Id.*

ALJ Lisewski examined the evidence submitted after ALJ Flanagan's decision, finding it similar to the earlier records, and recounting the following facts in her decision. *Id.* The evidence showed Haynesworth had five appointments from November 2012 through September 2014. *Id.* On the November 2012 visit, Haynesworth reported he was dating, including going out to sporting games and movies. *Id.* The medical report indicated Dr. Liles had "urged" Haynesworth to seek employment, suggesting "fast food restaurant, warehouse job, driving, or a security guard." *Id.* At this visit, Haynesworth was described as "within normal limits." *Id.* Haynesworth returned to

treatment on December 5, 2013 and no explanation was given for the duration between visits.  *Id.*

Haynesworth again was seen on March 21, 2014, where he reported being approved for Medi-Cal

and having a seizure on March 3, witnessed by his mother and requiring emergency care, but

Haynesworth had failed to produce any medical records from the event.  *Id.*  The progress note

stated Haynesworth was within normal limits.  *Id.* at 27.  At the June of 2014 appointment,

Haynesworth reported "anger, irritability, low stress tolerance, and paranoia."  *Id.*  Dr. Liles'

report indicated that Haynesworth may not have been complying with his medications.  *Id.*

Haynesworth was still within normal limits.  *Id.*  The final appointment with Dr. Liles in the

records was on September 18, 2014.  *Id.*  Dr. Liles noted Haynesworth looked healthier, was off

drugs, and was looking for a job and contemplating technical school.  *Id.*

On October 23, 2014, Dr. Liles made an assessment of Haynesworth's functional ability,

similar to the one he did for ALJ Flanagan.  *Id.*  ALJ Lisewski criticized this report, finding

"[d]espite the consistently normal attributes and the improvements with medications, Dr. Liles

opined that the claimant would have marked difficulties in maintaining social functioning and

marked difficulties with concentration, persistence and pace."  *Id.*  ALJ Lisewski found "no

references to the underlying treatment notes to explain how the normal findings related to the

marked limitations."  *Id.*  Additionally, ALJ Lisewski was concerned that Dr. Liles did not

"explain why the significant improvements once the claimant became compliant with medications

did not result in more functionality."  *Id.*  Based on these inconsistencies, ALJ Lisewski

determined Dr. Liles' opinion merited reduced weight.  *Id.*

ALJ Lisewski also gave reduced weight to the opinions from Dr. Franklin and Dr. Catlin.

*Id.*  Dr. Franklin evaluated Haynesworth in August of 2013, and concluded Haynesworth would

have marked difficulties in all aspects of work activity.  *Id.*  When Haynesworth saw Dr. Franklin,

it had been eight months since his last appointment with Dr. Liles.  *Id.*  Dr. Franklin's opinion

indicated, however, that Haynesworth stated he was complying with his medication, although he

was self-administering it and Dr. Franklin remarked that it was "'unclear if [self-administrating

was] working.'"  *Id.* (ALJ's opinion quoting Dr. Franklin's treatment notes).  ALJ Lisewski

instead inferred Haynesworth's lack of treatment meant he was not complying with his

26

medication. *Id.* Therefore, ALJ Lisewski determined because Dr. Franklin "would have been under the mistaken impression that the claimant was following a medication regimen," her opinion deserved less weight. *Id.* In October 2014, Haynesworth saw Dr. Catlin, who also concluded that Haynesworth would have severe impairments with all aspects of work functioning. *Id.* at 27–28. Dr. Catlin's opinion also noted Haynesworth had told her he was complying with his medications during the past nine months. *Id.* at 27. ALJ Lisewski, however, pointed out that Dr. Liles' June 2014 report expressed doubt as to Haynesworth's compliance. *Id.*

ALJ Lisewski found Dr. Catlin and Dr. Franklin's evaluations "remarkably similar" but did not "find a reason to assign more than a little weight to either of them." *Id.* at 28. This was because, according to ALJ Lisewski, each was based on subjective statements from Haynesworth that the ALJ presumed each doctor accepted as true. *Id.* ALJ Lisewski found evidence that Haynesworth's statements "are less than fully credible." *Id.* ("For example, his statements about compliance with, or even taking, medications are questionable, based on the lack of treatment from November 2012 until December 2013 and the doubts about compliance expressed by Dr. Liles."). ALJ Lisewski also noted that "both evaluations were obtained by counsel for the purpose of establishing eligibility for benefits and not for treatment purposes," and thus deserved less weight. *Id.* Finally, ALJ Lisewski asserted that neither doctor reviewed the other medical records, and therefore did not know about Haynesworth's compliance with medications or the significant duration between treatments. *Id.* ALJ Lisewski accordingly gave little weight to the opinions of Drs. Franklin and Catlin. *Id.* ALJ Lisewski gave considerable weight to the state agency consultant, Drs. Lee and Lucila, who construed Haynesworth's medical records as showing improved results when Haynesworth complied with his medications. *Id.*

ALJ Lisewski further found that Haynesworth's "allegations as to the severity of his symptoms are not credible, to the extent that he alleges he is incapable of any work activity." *Id.* This was based on the medical records, specifically focusing on the gaps in treatment and medication compliance, and lack of a treating or examining physician "reliably" finding Haynesworth disabled. *Id.*

e. **Step 5: Ability to Perform Other Jobs in the National Economy**

ALJ Lisewski found, based on Haynesworth's, residual functional capacity, age, education, and work experience in conjunction with the vocational guidelines, that there were jobs in the national economy that Haynesworth could perform. *Id.* at 29–30. Specifically, ALJ Lisewski adopted ALJ Flanagan's conclusions regarding the work Haynesworth could perform: industrial cleaner, cleaner II, and house cleaner. *Id.* at 30. Therefore, ALJ Lisewski concluded Haynesworth was capable of making a successful adjustment to other work in the national economy, and thus, a finding of "not disabled" was appropriate. *Id.*

\* \* \*

Haynesworth appealed ALJ Lisewski's decision on April 17, 2015. *Id.* at 282–93. The Appeals Counsel denied the request for review on May 17, 2016. *Id.* at 1.

E. **Motions for Summary Judgment**

1. **Haynesworth's Motion for Summary Judgment**

Haynesworth's motion for summary judgment requests the Court reverse the Commissioner's final decision and remand the matter in accordance with 42 U.S.C. § 405(g). Pl.'s Mot. at 1. The period of alleged disability under review is from March 1, 2013 through January 21, 2015. *Id.* at 5.

Haynesworth presents six issues to the Court: (1) whether ALJ Lisewski erred in evaluating the medical opinions; (2) whether ALJ Lisewski erred in finding Haynesworth's testimony not credible, without providing clear and convincing reasons supported by substantial evidence; (3) whether ALJ Lisewski erred in determining Haynesworth's impairments did not meet or equal a listed impairment; (4) whether ALJ Lisewski erred in determining Haynesworth's residual functional capacity; (5) whether ALJ Lisewski erred in determining Haynesworth could perform other work; and (6) whether the Court should remand for payment of benefits or further proceedings. *Id.* at 4.

Haynesworth contends that ALJ Lisewski erred in rejecting the opinions of Drs. Liles, Franklin, and Catlin and affording too much weight to state agency consultants Drs. Lee and Lucila's opinions. *Id.* at 8–18. Haynesworth argues that ALJ Lisewski rejected Drs. Liles,

Franklin, and Catlin's opinions without providing "specific and legitimate reasons supported by substantial evidence." *Id.* at 8–17. With respect to Drs. Lee and Lucila's opinions, Haynesworth argues ALJ Lisewski erred in according more weight to those consulting doctors than she did to the treating and examining doctors. *Id.* at 17.

Haynesworth next argues that ALJ Lisewski erred in not finding his testimony credible based on his "'lack of follow through and periodic non-compliance with medical treatment' and alleged improvement with medication compliance, and because, 'no treating or evaluating physician reliably finds him disabled from work.'" *Id.* at 19 (quoting AR at 28). Haynesworth argues these reasons are not clear and convincing, supported by substantial evidence. *Id.*

Haynesworth additionally argues if ALJ Lisewski appropriately evaluated and assigned weight to the opinions of Drs. Liles, Franklin, and Catlin, "she would have determined that [Haynesworth's] conditions meet or equal a listed impairment." *Id.* at 21.

Haynesworth further argues that if ALJ Lisewski had not rejected the opinions of Drs. Liles, Franklin, and Catlin, as well as Haynesworth's testimony, "she would have included [Haynesworth's] marked and extreme mental impairments" in her RFC determination. *Id.* at 22. According to Haynesworth, ALJ Lisewski's determination that he could perform "'simple repetitive tasks in a low-stress work environment, with no more than occasional social contact'" is not supported by the medical record. *Id.* (quoting AR at 28).

But for ALJ Lisewski's error in determining Haynesworth's RFC, Haynesworth argues that she would not have determined Haynesworth was able to perform work. *Id.* Additionally, Haynesworth argues ALJ Lisewski improperly relied on an incomplete hypothetical in determining he was able to perform work. *Id.*

Finally, Haynesworth argues that the Court should remand the matter with instructions to ALJ Lisewski to calculate and award benefits because all the conditions of the "credit-as-true" rule are met. *Id.* at 24. In the alternative, Haynesworth argues the Court should remand the matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g). *Id.* at 25.

### 2. The Commissioner's Cross-Motion for Summary Judgment

The Commissioner moves for summary judgment and requests the Court affirm the final

decision because Haynesworth fails to demonstrate any legal error. Comm'r's Mot. at 1. In the alternative, the Commissioner requests the Court remand the matter for further administrative development instead of awarding benefits. *Id.* at 14.

The Commissioner argues there is substantial evidence in the record to support ALJ Lisewski's evaluation of the medical opinion evidence and rejection of Drs. Liles, Franklin, and Catlin's opinions. *Id.* at 4–13. The Commissioner argues that ALJ Lisewski's decision finding Dr. Liles' opinion of "extreme and marked limitations" inconsistent and unsupported by the findings in Dr. Liles' treatment notes is supported by substantial evidence. *Id.* at 4–6. Additionally, the Commissioner argues ALJ Lisewski was also correct in discrediting Dr. Franklin's opinion. *Id.* at 6. According to the Commissioner, Dr. Franklin "accepted [Haynesworth's] subjective allegations" in writing her opinion and did not "see[] the rest of the medical evidence in the record." *Id.* The Commissioner supports this position by relying on Haynesworth's purported medication compliance inconsistencies. Specifically, the Commissioner argues that Dr. Franklin concluded Haynesworth was compliant with his medication in her August 2013 report, but Dr. Liles' June 2014 report stated he was suspicious of Haynesworth's medication compliance. *Id.* The Commissioner argues that because "Dr. Liles reported that [Haynesworth's] condition improved with medication, coupled with the fact that [Haynesworth] was not likely taking medication at the time of his consultative examination with Dr. Franklin, it was reasonable for ALJ Lisewski to give less weight to Dr. Franklin's opinion based on that examination." *Id.* at 6–7. Finally, the Commissioner contends that ALJ Lisewski was also correct in discrediting the opinion of Dr. Catlin for the same reasons she rejected Dr. Franklin's opinion. *Id.* at 7.

The Commissioner argues ALJ Lisewski was correct in relying instead on the opinion of state agency psychiatrist Dr. Lucila. *Id.* (citing *Bray v. Astrue*, 554 F.3d 1219 (9th Cir. 2009)). Dr. Lucila found Haynesworth "mentally capable of adapting to and performing sustained simple tasks, with limited public/peer and supervisor interactions." *Id.* at 7–8 (citing AR at 28, 127–28). The Commissioner argues ALJ Lisewski appropriately found Dr. Lucila's opinion supported by and consistent with the treatment notes from Dr. Liles. *Id.* (citing AR at 19, 27–28, 411–13).

Additionally, the Commissioner argues Haynesworth's poor compliance with his medication is evident from the fact that that Haynesworth was only treated five times since ALJ Flanagan's decision. *Id.* (citing AR at 26–28, 354–55, 418–19, 424, 427). The Commissioner contends that even though this non-compliance would exacerbate his symptoms, Dr. Liles nevertheless found Haynesworth's mental status examinations within normal limits, and therefore Haynesworth is not disabled. *Id.*

The Commissioner further argues ALJ Lisewski provided valid reasons based on substantial evidence to support her conclusion that Haynesworth's testimony regarding his disabling symptoms was not credible. *Id.* at 8–11. The Commissioner provides five reasons justifying this position. *Id.* at 9–11. First, the Commissioner argues ALJ Lisewski reasonably found that medical evidence did not support Haynesworth's testimony, noting Dr. Liles' medical reports always placed Haynesworth's mental status within normal limits. *Id.* at 9. Second, the Commissioner argues ALJ Lisewski properly discounted Haynesworth's testimony based on the effectiveness of his medical treatment. *Id.* at 9–10. The Commissioner argues that Haynesworth's "'marked improvement and good results when he [was] compliant'" with his medication constituted a valid reason to reject Haynesworth's testimony that he was more restricted than the RFC found. *Id.* (quoting AR at 28). Third, and related to the previous point, the Commissioner argues ALJ Lisewski was justified in discrediting Haynesworth's testimony because of the unexplained gaps in treatment and his poor compliance with treatment. *Id.* at 10. Fourth, according to the Commissioner, ALJ Lisewski properly evaluated Haynesworth's claims against the medical records and opinions in making her finding. *Id.* Fifth, the Commissioner argues ALJ Lisewski permissibly found that medical records and Haynesworth's testimony regarding his daily activities undermined his claim for disability. *Id.*

Additionally, the Commissioner argues that because ALJ Lisewski properly rejected the opinions of Drs. Liles, Franklin, and Catlin, it was correct for her to find that Haynesworth's impairment did not meet or equal the criteria in the appropriate listing. *Id.* at 11.

The Commissioner also contends ALJ Lisewski was correct in adopting ALJ Flanagan's RFC finding. *Id.* at 12. According to the Commissioner, ALJ Lisewski's determination was

supported by substantial evidence, including the medical record and Haynesworth's testimony. *Id.*

Finally, the Commissioner argues ALJ Lisewski properly used the VE in determining whether Haynesworth could perform other work that existed in significant numbers. *Id.* (citing AR at 29–30, 43–44). According to the Commissioner, ALJ Lisewski's hypotheticals were supported by substantial evidence and she was not required to add additional limitations not supported by the record. *Id.*

### 3. Haynesworth's Reply Memorandum

Haynesworth's reply addresses largely the same issues as his motion, and requests the Court remand for payment of benefits, or in the alternative, for further proceedings. *See generally* Reply (dkt. 26).

Haynesworth's reply again argues that ALJ Lisewski erred in discrediting Drs. Liles, Franklin, and Catlin's opinions. *Id.* at 4–9. Haynesworth stresses that the Court should not rely on the Commissioner's post hoc reasons supporting ALJ Lisewski's determination of the weight assigned to Dr. Liles opinion. *Id.* at 4–5. Additionally, even if these new reasons had been included in ALJ Lisewski's opinion, Haynesworth contends that they still do not meet the applicable standard. *Id.* at 5–6.

Haynesworth also disputes the Commissioner's position that ALJ Lisewski was correct in discrediting Dr. Franklin's opinion. *Id.* at 7–8. Haynesworth reiterates his argument that the basis ALJ Lisewski cited for discrediting the opinion—that Dr. Franklin purportedly relied solely on Haynesworth's subjective statements—is not supported by the record, because Dr. Franklin conducted her own psychological evaluations, including a clinical interview, and reviewed the medical records available at that time. *Id.* at 7. Further, Haynesworth notes that Dr. Franklin found his condition "severe and longstanding" and therefore argues that even if she had been able to see records following her examination, there is no evidence in her opinion that it would have changed had she had access to the post-examination records. *Id.* at 7–8 (citing AR at 388–89). Finally, Haynesworth points out that Dr. Franklin came to the same conclusions as Dr. Liles and Dr. Catlin, both of whom reviewed all of Haynesworth's treating records. *Id.* at 7 (citing AR 391, 447–51).

Haynesworth also argues that ALJ Lisewski failed to provide adequate justification for discrediting Dr. Catlin's opinion. *Id.* at 8. Haynesworth contests the Commissioner's argument that ALJ Lisewski justifiably rejected Dr. Catlin's opinion because Dr. Catlin did not report reviewing any records. *Id.* Haynesworth argues that Dr. Catlin did in fact review all the records, including any that might have shown Haynesworth was not complying with his medication. *Id.* at 8–9 (citing AR 452).

As for the ALJ's reliance on non-examining physicians, Haynesworth argues that the Commissioner's reliance on *Bray v. Astrue* is misplaced, and that *Bray* is distinguishable from the present case because the non-examining doctor's opinion in that case regarding the claimant's mental impairments was not contradicted by other evidence in the record. *Id.* at 9 (citing *Bray*, 554 F.3d at 1229). According to Haynesworth, Dr. Lucila and Dr. Lee's opinions here were contradicted by the treating and examining doctors. *Id.* at 8–9. Haynesworth therefore argues that *Bray* is not controlling and does not support ALJ Lisewski's decision to rely heavily on Dr. Lucila and Dr. Lee's opinions. *Id.*

With regards to Haynesworth's gap in treatment, Haynesworth argues there is no evidence in the record that additional treatment during this yearlong gap would have affected the effectiveness of his treatment. *Id.* at 10. Further, Haynesworth contends that when a claimant has failed to engage in treatment, the ALJ "'must not draw any inferences about an individual's treatment without first considering any explanation that the individual may provide,' including inability to afford treatment." *Id.* (quoting Social Security Ruling 96-7). According to Haynesworth, the gap in treatment is explained by his lack of health insurance and inability to afford treatment. *Id.*

Haynesworth further argues that ALJ Lisewski failed to provide clear and convincing reasons to justify rejecting Haynesworth's testimony. *Id.* at 11. Haynesworth argues that the Commissioner cited the wrong legal standard in arguing the credibility determination is entitled to deference because the more specific standards set forth in *Lester*, 81 F.3d at 834, and *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1991), have superseded the Ninth Circuit's earlier discussion of the issue in *Bunnel v. Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991). Reply at 10–11.

1    Haynesworth argues that ALJ Lisewski was required to identify what testimony was not credible

2    and what evidence undermined it, which according to Haynesworth, she failed to do. *Id.*

3    Haynesworth's reply also addresses the three reasons the Commissioner provided to justify

4    discrediting Haynesworth's testimony, arguing that gaps in treatment do not undermine his

5    credibility, that his testimony was consistent with Dr. Liles' treatment notes, and that his activities

6    of daily living—which ALJ Lisewski did not cite as a reason for her adverse credibility finding—

7    are consistent with his alleged disability. *Id.* at 11–13.

8    Haynesworth goes on to argue that had ALJ Lisewski relied on Drs. Liles, Franklin, and

9    Catlin's opinions, she would have determined that Haynesworth was disabled at Step Three. *Id.* at

10   13. Further, Haynesworth argues that ALJ Lisewski erred in determining his residual functional

11   capacity because she failed to properly take into account Drs. Liles, Franklin, and Catlin's

12   opinions and instead adopted ALJ Flanagan's determination without accounting for additional

13   records submitted after that decision. *Id.* at 14.

14   In conclusion, Haynesworth requests the Court remand for payment of benefits on the

15   basis that ALJ Lisewski would have been required to find him disabled had she properly credited

16   his testimony and the opinions of his doctors. *Id.* In the alternative, Haynesworth requests the

17   Court remand for further administrative development. *Id.*

18   **III.    ANALYSIS**

19       **A.    Legal Standard Under 42 U.S.C. § 405(g)**

20   District courts have jurisdiction to review the final decisions of the Commissioner and

21   have the power to affirm, modify, or reverse the Commissioner's decisions, with or without

22   remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

23   When asked to review the Commissioner's decision, the Court takes as conclusive any

24   findings of the Commissioner which are free from legal error and supported by "substantial

25   evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind

26   might accept as adequate to support a conclusion," and it must be based on the record as a whole.

27   *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence means "more than a mere

28   scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*,

846 F.2d 573, 576 (9th Cir. 1988). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez*, 573 F.2d at 655. In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion. *Smolen*, 80 F.3d at 1279 (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *See Garrison*, 759 F.3d at 1019−21.

### B.      Evaluation of Medical Opinions

#### 1.      Legal Standard

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."[5] *Lester*, 81 F.3d at 830. "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citations omitted). "'The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician.'" *Id.* (quoting *Lester*, 81 F.3d at 831). The Ninth Circuit has recently emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a contradictory medical opinion:

"If a treating or examining doctor's opinion is contradicted by

---

[5] Psychologists' opinions are subject to the same standards as physicians' opinions. *See* 20 C.F.R. § 404.1527(a)(2); *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (applying standards discussing physicians' opinions to evaluate an ALJ's treatment of a psychologist's opinion).

another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id.* This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick* [*v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)]. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion. *See id.*

*Garrison*, 759 F.3d at 1012−13 (footnote omitted).

### 2. ALJ Lisewski Erred in Assigning Little Weight to Dr. Liles' Opinion

Treating physicians bring a "unique perspective to the medical evidence." 20 C.F.R. § 404.1527(d)(2); *Lester*, 81 F.3d at 833. "The treating physician's continuing relationship with the claimant makes him especially qualified to evaluate reports from examining doctors, to integrate the medical information they provide, and to form an overall conclusion as to functional capacities and limitations, as well as to prescribe or approve the overall course of treatment." *Lester*, 81 F.3d at 833.

Dr. Liles began treating Haynesworth on July 25, 2012. AR at 348. Since ALJ Flanagan's decision, Dr. Liles has treated Haynesworth on five separate occasions. *Id.* at 409–36. In addition, on October 23, 2014, Dr. Liles completed the Questionnaire, setting forth his opinion of Haynesworth's relevant limitations. *Id.* at 449–52. ALJ Lisewski rejected Dr. Liles' Questionnaire on the grounds that (1) Dr. Liles made no reference to his treating notes, which noted "normal attributes and the improvement with medications," in finding Haynesworth's would have marked difficulties, and (2) Dr. Liles "did not explain why significant improvements once . . . [Haynesworth] became compliant with medications did not result in more functionality." *Id.*

36

at 27. Instead, ALJ Lisewski relied on the opinions of the state agency consultants, which found Haynesworth at most moderately limited—contradicting the opinion of Dr. Liles, who found Haynesworth would have marked and extreme limitations. *Id.* at 28, 102–132, 449–52. The Court holds that the ALJ erred in disregarding Dr. Liles' opinion because neither of the two reasons offered by the ALJ was "specific and legitimate" and supported by substantial evidence in the record. *See Ryan*, 528 F.3d at 1198.

### a. Dr. Liles' Purported Failure to Reference His Treating Notes in His Questionnaire

ALJ Lisewski concluded Dr. Liles' Questionnaire was not credible first because he did not explain how he got from his treating notes, which always stated Haynesworth was within "normal limits," to the Questionnaire, which stated Haynesworth would have "marked difficulties" in maintaining social function and with concentration, persistence, and pace. AR at 27. Dr. Liles' Questionnaire states he relied on mental status examinations and clinical interviews to demonstrate the severity of Haynesworth's symptoms and mental impairments. *Id.* at 449. Each of Dr. Liles' reports indicated that Haynesworth was within normal limits on the mental status examination. *See generally id.* at 409–36. Dr. Liles' narratives, however, often described a very different story of functionality. For example, at the June 2014 appointment Haynesworth reported that he had "anger, irritability, low stress tolerance and was paranoid and out of control," and Dr. Liles characterized him as "passive, helpless, . . . difficult to treat, in denial," and "almost housebond." *Id.* at 418–19. The report from that visit nevertheless states that Haynesworth's mental status examination was within normal limitations. *Id.* at 419. At the September 2014 visit, Dr. Liles described Haynesworth as looking healthier and much better. *Id*. at 412–13. Haynesworth's mental status examination was still within normal limits. *Id.* at 413. The discrepancy between, on one hand, Liles' consistent "within normal limits" diagnoses for Haynesworth's mental status examinations, and on the other hand, the range of Dr. Liles' more holistic assessments that at times characterized Haynesworth as virtually incapacitated, suggests that Dr. Liles did not believe the mental status examinations fully captured Haynesworth's condition, and based his overall conclusions as to Haynesworth's capabilities on more than merely those tests. ALJ Lisewski's

United States District Court
Northern District of California

characterization of the treatment records as showing "consistently normal attributes," *id*. at 27, improperly focuses on only one component of Dr. Liles' assessments, without regard to Dr. Liles' own interpretation of Haynesworth's condition.

Additionally, it is not dispositive that the mental status examinations indicate Haynesworth was "within normal limits" given that "[t]he primary function of medical records is to promote communication and recordkeeping for health care personnel—not to provide evidence for disability determinations." *Orn*, 495 F.3d at 634; AR at 333–78, 409–36. Dr. Liles' finding that Haynesworth was "within normal limits" during an in-office examination does not in itself demonstrate that Haynesworth would not have marked functional limitations with respect to performance of work activities, particularly given that Dr. Liles' treatment notes as a whole reflect Haynesworth's persistent difficulties in daily life. It is certainly plausible that a person experiencing significant, even debilitating, mental health symptoms related to social interactions with peers and the public might nevertheless exhibit "normal" performance in a one-on-one setting with a trusted doctor. The Court therefore holds that ALJ Lisewski's reference to Haynesworth's mental status examinations does not constitute "specific, legitimate reasons" supported by substantial evidence contained in the record to justify discrediting the opinion of treating physician, Dr. Liles. *See Garrison*, 759 F.3d at 1012.

### b. Dr. Liles' Alleged Lack of Explanation Regarding Improvements When Haynesworth was Compliant with His Medication

ALJ Lisewski's second reason for discrediting Dr. Liles' opinion was that he did not explain why Haynesworth's functioning did not improve during times of medication compliance. AR at 27. During the time of alleged disability, the September 2014 appointment was the only record that showed Haynesworth experienced any improvements. *Id.* at 409–36. Such "[r]eports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms." *Garrison*, 759 F.3d at 1017. "They must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace." *Id.*

In June 2014, Haynesworth was treated for "anger, irritability, [and] low stress tolerance," reporting he felt "paranoid and out of control." AR at 416–21. In his treating notes, Dr. Liles indicated he suspected poor compliance with the medication, but still wrote that Haynesworth's medication adherence was "good." *Id.* at 417. There is no other evidence Haynesworth was not taking his medication. *Id.* at 416–21. The purported failure to mention the relationship between Haynesworth's condition in June of 2014 and improvements thereafter does not support the ALJ's conclusion.

Further, there is no evidence that any improvements Haynesworth experienced over the course of his treatment would increase his functional capacity. *See Garrison*, 759 F.3d at 1017. For example, when Dr. Liles noted Haynesworth showed improvements at the September 2014 appointment, he stated Haynesworth gained weight and talked about his future. AR at 412–13. However, Haynesworth still had issues with anxiety, impulse control, mood stability, psychosis and self-esteem. *Id.* at 414. Dr. Catlin, who saw Haynesworth shortly after that visit, described Haynesworth as suffering from extreme depression, anxiety, and lack of motivation to live or improve his life. *Id.* at 437–38. Dr. Liles' Questionnaire, completed in October of 2014, also indicated that Haynesworth had generally poor cognitive functioning. *Id.* at 450. Both Dr. Liles and Dr. Catlin, who wrote their opinions shortly after the September 2014 visit that allegedly showed Haynesworth's improvement when compliant with medication, found him to have marked to extreme limitations. *Id.* at 449. The Court therefore holds that Haynesworth's relative improvement at his September 2014 visit with Dr. Liles does not, in itself, constitute sufficient evidence that his limitations can be mitigated by treatment such that the ALJ could set aside the opinion of Haynesworth's treating physician.

* * *

Based on the aforementioned, the Court holds ALJ Lisewski failed to "set forth specific, legitimate reasons" supported by substantial evidence for discrediting the opinion of Dr. Liles. *See Garrison*, 759 F.3d at 1012.

### 3. ALJ Lisewski Erred in Assigning Little Weight to Drs. Franklin and Catlin's Opinions

ALJ Lisewski assigned little weight to the opinion of examining psychologists Drs. Franklin and Catlin, both of whom characterized Haynesworth's limitations as marked to extreme. AR at 28, 391, 447–48. Drs. Franklin and Catlin each examined Haynesworth, *see id.* at 379–91, 437–48, and their opinions are therefore entitled to substantial weight unless (1) the ALJ presented clear and convincing reasons to reject them, supported by substantial evidence, or (2) they are contracted by other medical opinions and the ALJ provided specific and legitimate reasons to reject them, supported by substantial evidence. *See Ryan*, 528 F.3d at 1198.

ALJ Lisewski gave the same three reasons as to why she rejected Drs. Franklin and Catlin's opinions: (1) their opinions were based entirely on Haynesworth's subjective statements, which ALJ Lisewski found less than fully credible, (2) their opinions were procured by Haynesworth's representative, and (3) they did not review all medical evidence of treatment that was contained in the record at the time of ALJ Lisewski's subsequent decision. AR at 28. ALJ Lisewski relied on the opinions of the state agency consultants, which found Haynesworth was at most moderately limited, contradicting the opinions of Drs. Franklin and Catlin. *Id.* at 28, 102–32, 390–91, 445–48. Therefore, she must provide specific and legitimate reasons to reject them, supported by substantial evidence. *See Ryan*, 528 F.3d at 1198. The Court holds that the ALJ erred in disregarding Drs. Franklin and Catlin's opinions because none of the aforementioned reasons were "specific and legitimate" and supported by substantial evidence in the record. *See Ryan*, 528 F.3d at 1198.

### a. Basis of Drs. Franklin and Catlin's Opinions

ALJ Lisewski's assigned little weight to Drs. Franklin and Catlin's opinions because she construed them as based entirely on Haynesworth's subjective statements,[6] which ALJ Lisewski found less than fully credible because the "the lack of treatment from November 2012 until December 2013 and the doubts about compliance expressed by Dr. Liles" called into question whether he had taken his medication. AR at 28. For the reasons explained below, the Court holds

---

[6] This order addresses the credibility of Haynesworth's statements in the next section.

ALJ Lisewski erred in rejecting Drs. Franklin and Catlin's opinions because that rationale is not supported by substantial evidence contained in the record. *See Ryan*, 528 F.3d at 1198.

Haynesworth argues that Drs. Franklin and Catlin's opinions were not based only on subjective statements, but also on relevant medical records and numerous psychological tests. Mot. at 14, 16 (citing AR at 379, 437, 452). The Court agrees. Dr. Franklin's report states she reviewed the records from the Schuman Liles Clinic and John George Pavilion as well as administered multiple psychological tests during the evaluation. AR at 379. Dr. Catlin's report and April 2015 supplement letter state she reviewed all the medical records from the Schuman Liles Clinic, Dr. Franklin's report, John George Pavilion records, and Pathways to Wellness records. *Id.* at 379, 452. Additionally, Dr. Catlin also administered numerous psychological tests. *Id.* at 379. Dr. Franklin did not have Dr. Liles's progress reports that took place after she conducted her examination, which ALJ Lisewski's claims would have shown Haynesworth was not complying with his medication and therefore his statements were questionable, but Dr. Catlin did. *Id.* at 379, 452. Dr. Franklin's opinion notes Haynesworth was self-administering his medication, and it was not clear if that was working. *Id.* at 389. Further, Dr. Franklin acknowledges Haynesworth's conflicting feelings towards his medication. *Id.* at 381. The record does not support ALJ Lisewski's assertion that Drs. Franklin and Catlin's evaluations were "based entirely on the subjective statements of the claimant, which both doctors . . . accepted uncritically as true." *Cf. id.* at 28.

Even if Drs. Franklin and Catlin's opinions were based partially on subjective statements, the Ninth Circuit has held "an ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations." *Ryan*, 528 F.3d at 1199–1200 (9th Cir. 2008) (citing *Edlund v. Massanari*, 253 F.3d 1152, 1159 (9th Cir. 2001)). Drs. Franklin and Catlin did not discredit any of Haynesworth's complaints and supported their conclusions with ample objective testing, as detailed in their respective reports. AR at 379–91, 437–48. Additionally, according to the M-FAST test administered by Dr. Franklin, which measures whether a client is prone to overstate or exaggerate

symptoms, there was no indication of malingering. *Id.* at 386.

Therefore, the Court holds that this reason for rejecting Drs. Franklin and Catlin's opinions is not supported by the record.

### b.    Procurement of Drs. Franklin and Catlin's Opinions by Haynesworth's Counsel

"The purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them. An examining doctor's findings are entitled to no less weight when the examination is procured by the claimant than when it is obtained by the Commissioner." *Lester*, 81 F.3d at 832 (internal citations omitted). "The ALJ is responsible for determining the credibility and resolving conflicts in medical testimony," *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), and is permitted "to question a doctor's credibility because, as here, the doctor's opinion letter had been solicited by the claimant's counsel." *Saelee v. Chater*, 94 F.3d 520, 522–23 (9th Cir.1996) (citing *Burkhart v. Bowen,* 856 F.2d 1335 (9th Cir. 1988)). "[T]he source of a referral [can] be relevant where there is no objective medical basis for the opinion, . . . and where there is evidence of 'actual improprieties' on the part of the doctor whose report the ALJ chooses to reject." *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996) (citing *Saelee*, 94 F.3d at 523; *Burkhart*, 856 F.2d at 1339). "Actual improprieties" have been found when there was "inconsistency between [a doctor's] treating notes and the report . . . submitted to the ALJ or evidence that [a doctor] was deliberately attempting to mislead the ALJ for the purpose of helping claimant obtain benefits." *Nguyen*, 100 F.3d at 1465 (citing *Saelee*, 94 F.3d at 522–23 (holding that the ALJ did not abuse his discretion by rejecting the retained doctor's opinion as "untrustworthy because it was obtained solely for the purposes of the administrative hearing, varied from . . . [the doctor's] own treatment notes, and was worded ambiguously in an apparent attempt to assist . . . [the claimant] in obtaining social security benefits")). Where such factors are not present, however, a doctor's credibility "is not subject to attack on the basis of the source of his patient's referral." *Id.*

ALJ Lisewski concluded that Drs. Franklin and Catlin's opinions were obtained "to establish eligibility for benefits and not for treatment purposes." AR at 28. ALJ Lisewski

acknowledged that this did not mean the opinions were not legitimate or did not deserve due consideration, but ultimately found the context in which they were procured could not be ignored and lessened the weight assigned. *Id.* at 28.

Like in *Nguyen*, and unlike in *Saelee*, there is no evidence of any "actual improprieties" in the record to support ALJ Lisewski discrediting these doctors' opinions based on the fact that they were procured by Haynesworth's representative. *See Nguyen*, 100 F.3d at 1464–65; *cf. Saelee*, 94 F.3d at 522–23. Moreover, their opinions are not "wholly conclusory," and are supported by objective medical evidence in the way of in person examination of Haynesworth, medical records review, and numerous psychological tests. *Nguyen*, 100 F.3d at 1464–65; AR at 379–91, 437–48. The Court therefore holds that ALJ Lisewski erred in relying on the source of referral to discredit Drs. Franklin and Catlin's opinions.

### c.      Review of Medical Records

Finally, ALJ Lisewski assigned little weight to Drs. Franklin and Catlin's opinions because they did not have the "benefit of reviewing the other medical reports contained in the current record." AR at 28. Particularly concerning to ALJ Lisewski was that without these records, Drs. Franklin and Catlin would not have evidence indicating Haynesworth was not compliant with his medication or that there was a long period in between treatments. *Id.* This reason is not supported by the record.

Dr. Franklin examined Haynesworth on August 23, 2013, and at that time, she had all available records. AR at 379–91. The most current medical record Dr. Franklin reviewed was from November 2012, about seven months prior to her examination. *Id.* at 379, 381–82. Given the lack of more recent medical records, Dr. Franklin would have been aware of this long gap in treatment. Additionally, Dr. Franklin's opinion acknowledges Haynesworth was not always compliant with his medication. *Id.* at 381 (acknowledging Haynesworth's report that he was "not always compliant with his medications" and sometimes stopped them because "he did not believe they were helping" or "he ran out of money and had no insurance"). Dr. Franklin wrote that Haynesworth was currently taking his medication, but did not explain what evidence supported that claim. *Id.* at 381–82.

Dr. Catlin performed her examination on October 21, 2014. Dr. Catlin states she reviewed all of Haynesworth's medical records—the same records that ALJ Lisewski relied on in her opinion. *Id.* at 437, 452. Further, Dr. Catlin's April 2015 letter acknowledges that she was aware of Haynesworth's lack of treatment and poor medication compliance in the past. *Id.* at 452. The letter goes on to state that Dr. Catlin believed the medication Haynesworth had been taking had "reached their therapeutic levels by the time [she] interviewed him" and Haynesworth's "functioning should have accurately reflected his ability to function with medication." *Id.* ALJ Lisewski herself acknowledged Haynesworth was compliant with his medication from June 2014 through September 2014, and identified no evidence that Haynesworth ceased compliance in the month between that period and Dr. Catlin's October examination. *Id.* at 28, 437, 452. It is not clear what records ALJ Lisewski believed Dr. Catlin lacked in preparing her evaluation.

Additionally, the state agency consultants on whom ALJ Lisewski's opinion heavily relies also did not review all Haynesworth's medical record in making their opinions. *Id.* at 102–32. Both opinions were rendered prior to Haynesworth returning to Dr. Liles on December 2013 for more consistent treatment. *Id.*; *see also Herron v. Astrue*, 407 F. App'x 139, 141 (9th Cir. 2010) (holding that an ALJ erred in assigned great weight to the non-examining physician when that physician "did not review a substantial portion of the relevant medical evidence, including the records from [claimant's] treating physicians and nurse practitioner" (citing 20 C.F.R. §§ 404.1527(a)–(e), (f)(2)(ii))). ALJ Lisewski's opinion does not address why a purported lack of access to records should diminish the credibility of Drs. Franklin and Catlin, but not the credibility of the state agency consultants. Given these inconsistencies in analysis, the Court finds ALJ Lisewski's reasoning unsupported by substantial evidence in the record.

\* \* \*

ALJ Lisewski rejected Drs. Franklin and Catlin's opinions on the grounds that (1) their opinions were based entirely on Haynesworth's subjective statements, which ALJ Lisewski found less than fully credible, (2) their opinions were procured by Haynesworth's representative, and (3) they did not review all medical records ALJ Lisewski relied on. AR at 28. The Court holds ALJ Lisewski erred in disregarding Drs. Franklin and Catlin's opinion because the three reasons

offered were not "specific and legitimate" and supported by substantial evidence. *See Ryan*, 528 F.3d at 1198.

### 4. ALJ Lisewski Erred in Assigning Great Weight to State Agency Consultants Drs. Lee and Lucila's Opinions

Drs. Lee and Lucila are non-examining physicians, and their opinions are therefore not entitled to the same weight as treating and examining doctors. *See Lester*, 81 F.3d at 830 ("As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."). "[N]onexamining sources have no examining or treating relationship with [the claimant]" and thus "the weight [an ALJ] will give their opinions will depend on the degree to which they provide supporting explanations of their opinions." *Morgan v. Colvin*, 531 F. App'x 793, 795 (9th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(3)).

ALJ Lisewski assigned great weight to these opinions because she believed they "confirmed [Haynesworth's] condition improved with compliance to treatment" and were supported by medical evidence that transpired after they completed their evaluations. *Id.* at 28. The Court holds ALJ Lisewski erred in assigning greater weight to Drs. Lee and Lucila's opinions than those of the treating and examining physicians, whose opinions—as discussed above—the ALJ rejected without providing specific and legitimate reasons to justify doing so.

## C. Evaluation of Claimant's Testimony

### 1. Legal Standard

"[T]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). "The ALJ's findings, however, must be supported by specific, cogent reasons." *Id.* "In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012).

"First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal

quotation marks and citation omitted); *see also Molina*, 674 F.3d at 1112; *Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) ("Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." (internal quotation marks and citation omitted)).

"Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter*, 504 F.3d at 1036 (internal quotation marks and citation omitted); *see also Molina*, 674 F.3d at 1112; *Valentine v*, 574 F.3d at 693; *Vasquez*, 572 F.3d at 591–93 (concluding that ALJ failed to provide "specific, clear, and convincing" reasons to support an adverse credibility determination); *Lester*, 81 F.3d at 834; *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Berry*, 622 F.3d at 1234 (internal quotation marks and citation omitted); *see also Lester*, 81 F.3d at 834; *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014) ("Although the ALJ's analysis need not be extensive, the ALJ must provide some reasoning in order for us to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence.").

### 2. ALJ Lisewski Erred in Discrediting Haynesworth's Testimony

ALJ Lisewski found Haynesworth's "medically determinable impairments reasonably could be expected to cause the alleged symptoms," satisfying the first part of the inquiry. AR at 25; *see Lingenfelter*, 504 F.3d at 1036. ALJ Lisewski did not identify any evidence of malingering, *see generally* AR at 20–30, and therefore was required to support her finding that Haynesworth's testimony was not credible with clear and convincing reasons. *Lingenfelter*, 504 F.3d at 1036.

ALJ Lisewski's opinion presents the following conclusory explanation for finding Haynesworth's "statements concerning the intensity, persistence and limiting effects of [his] symptoms not credible to the extent they are inconsistent with [the ALJ's] residual functional

46

capacity assessment":

> The first and primary factor I considered to reach this conclusion is the medical evidence, summarized below. In addition, I considered his allegations in light of certain credibility factors as set forth in the regulations, including the claimant's daily activities, the location, duration, frequency, and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage effectiveness, and side effects of medications; treatment other than medication; other measures used to relieve pain; and other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms (20 CFR 416.929).

AR at 25–26. ALJ Lisewski "conclude[d] that [Haynesworth's] allegations as to the severity of his symptoms are not credible, to the extent that he alleges he is incapable of any work activity," based on "the lack of follow through and periodic non-compliance with medical treatment for his symptoms, contrasted with the marked improvement and good results when he is compliance, and that no treating or evaluating physician reliably finds him disabled from work." *Id.* at 28.

As a starting point, ALJ Lisewski does not identify with any specificity "what testimony is not credible," as required by the Ninth Circuit. *Berry*, 622 F.3d at 1234. Moreover, simply listing various reasons for discrediting a claimant's testimony allowed by regulation does not meet the ALJ's burden to present "clear and convincing reasons" for disregarding such testimony. *See Lingenfelter*, 504 F.3d at 1036. The Court disregards the conclusory recitation of the regulation. As for purported inconsistencies between Haynesworth's testimony and medical evidence, ALJ Lisewski's opinion discusses the records from Drs. Liles, Franklin, Catlin, Lee, and Lucila. AR at 26–28. The Court holds ALJ Lisewski erred in her interpretation of that medical evidence, as discussed above. ALJ Lisweski's remaining reasons for discrediting Haynesworth's testimony— inconsistent treatment and compliance, improvement with medication, lack of independent evidentiary support for the severity of his symptoms, and daily activities—are addressed below.

### a. Medical Treatment, Medication Compliance, and Improvement

The Ninth Circuit has determined it is an "error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat

47

them as a basis for concluding a claimant is capable of working." *Garrison*, 759 F.3d at 1017 (citing *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001)). In *Garrison*, the ALJ found that the claimant's "condition had improved due to medication at a few points" and "that some of [the claimant's] mental impairments were caused by [the claimant] going off her medication." *Id.* at 1016–17. In reviewing the ALJ's decision, the Ninth Circuit held that these were "not clear, convincing, and specific grounds for rejecting [the claimant's] testimony" regarding her symptoms and the ALJ "improperly singled out a few period of temporary well-being from a sustained period of impairment and relied on those instances to discredit [the claimant]." *Id.* at 1017–18.

ALJ Lisewski's analysis focused on two occasions when Haynesworth saw improvements in his symptoms: October 23, 2012 and September 18, 2014. *See* AR at 28, 334, 411. Only the September 2014 appointment, however, took place during the time of alleged disability. *See id.*

Further, the only record during the alleged period of disability that supported ALJ Lisewski's finding that Haynesworth was not compliant with his medication was the June 20, 2014 report, where Dr. Liles noted that he "suspect[ed] poor compliance." AR at 418. Haynesworth, however, testified at trial that he "never stopped taking his medication that [Dr. Liles] prescribed" when asked about that note. *Id.* at 42. Regardless, given that there was only one instance of evidence to suggest poor compliance with medication, and that Haynesworth's treating and examining doctors characterized his limitations as marked or extreme at other times when there was no indication of inadequate medication compliance, Dr. Liles' June 2014 note expressing doubt as to Haynesworth's compliance at that time is not in itself a convincing reason to discredit Haynesworth's symptom testimony that was generally consistent with the opinions of his doctors.

Additionally, the Ninth Circuit has "criticized the use of a lack of treatment to reject mental complaints both because mental illness is notoriously underreported and because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'" *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299–300 (9th Cir. 1999) (citing *Nguyen,* 100 F.3d at 1465). Dr. Franklin noted that Haynesworth's appointments were scheduled by his grandmother or mother. AR at 389. Haynesworth's

difficulty obtaining medical insurance coverage, such as Medi-Cal, needed to afford treatment and his medication further hindered his ability to obtain consistent treatment. AR 351, 424. Additionally, Dr. Liles' progress notes indicate Haynesworth is difficult to treat and in denial about his mental health impairments. AR 424. The record as a whole indicates that this is the sort of case where Haynesworth's impairments could be expected to affect his ability to seek treatment and maintain a consistent medication regimen.

### b. Lack of Independent Evidentiary Support

"[T]he claimant is *not* required to show 'that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.' Nor must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the severity thereof.'" *Garrison*, 759 F.3d at 1014 (quoting *Smolen,* 80 F.3d at 1282). ALJ Lisewski found Haynesworth's "medically determinable impairments reasonably could be expected to cause the alleged symptoms." AR at 25; *see Garrison*, 759 F.3d at 1014. Haynesworth was therefore not required to prove the severity of his symptoms with evidence beyond his own testimony.

Further, ALJ Lisewski was incorrect in finding "no treating or evaluating physician reliably finds [Haynesworth] disabled from work" as justification to discredit his testimony. AR at 28. As discussed above, Drs. Liles, Franklin, and Catlin each found Haynesworth would have marked to extreme difficulties performing work. Further, Dr. Liles and Dr. Catlin found Haynesworth's impairment's would cause him to miss at least four days a month, and the VE testified that a person with impairments consistent with ALJ Lisewski's residual functional capacity assessment could only miss two days of work per month to remain employable. *Id.* at 44, 448–49. The Court holds that Haynesworth's testimony regarding his symptoms is supported by the evidence contained in the record. *Id.* at 28.

### c. Significance of Daily Activities

Finally, the Ninth Circuit has also "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace

49

environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016. ALJ Lisewski noted that Haynesworth engaged in activities including going out with a girlfriend, socializing, and making plans for further education and work. AR at 28. However, records regarding Haynesworth having a girlfriend predate his alleged onset of disability. *Id.* at 333–42 (November 21, 2012 and October 23, 2013 appointments). Haynesworth did report to Dr. Liles he was "hanging out with better people," looking online for a job, and thinking of school. *Id.* at 412–13. But absent evidence of activities more directly applicable to a work setting—e.g., *finding* a job rather than merely searching for one, or a clearer discussion of the types of social settings Haynesworth could tolerate—the fact that Haynesworth could do "more than merely resting in bed all day" is not sufficient to discredit his testimony. *See Garrison*, 759 F.3d at 1016. ALJ Lisewski therefore erred by failing to provide "specific, clear and convincing reasons" to disregard Haynesworth's testimony regarding the severity of his symptoms. *See Lingenfelter*, 504 F.3d at 1036

## D. Credit-as-True Rule

### 1. Legal Standard

If an ALJ has improperly failed to credit claimant testimony or medical opinion evidence, a district court must credit that testimony as true and remand for an award of benefits if three conditions are satisfied:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison*, 759 F.3d at 1020. Under such circumstances, a court should not remand for further administrative proceedings to reassess credibility. *See id.* at 1019−21. This "credit-as-true" rule, which is "settled" in the Ninth Circuit, *id.* at 999, is intended to encourage careful analysis by ALJs, avoid duplicative hearings and burden, and reduce delay and uncertainty facing claimants, many of whom "suffer from painful and debilitating conditions, as well as severe economic hardship." *Id.* at 1019 (quoting *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396,

1398−99 (9th Cir. 1988)).

A court may remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021. A court may also remand for the limited purpose of determining when a claimant's disability began if that date is not clear from the credited-as-true opinion. *See House v. Colvin*, 583 Fed. App'x 628, 629 (9th Cir. July 12, 2014) (citing, *e.g.*, *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010)). Outside of those circumstances, remand for further proceedings is an abuse of discretion if the credit-as-true rule establishes that a claimant is disabled. *Garrison*, 759 F.3d at 1020.

### 2. Haynesworth Is Entitled to Benefits

The Ninth Circuit's "settled" credit-as-true rule dictates that where the record has been fully developed, the ALJ has failed to provide sufficient reason to discredit a medical opinion, and crediting that opinion would require a finding that the claimant is disabled, a district court usually must remand for an award of benefits. *Garrison*, 759 F.3d at 999, 1019−21. The Court holds Haynesworth has satisfied all three conditions of the credit-as-true rule.

First, the Court finds no need for further development of the record or administrative proceedings. *See Garrison*, 759 F.3d at 1021−22. The record here includes evaluations by a treating doctor and multiple examining doctors, and Haynesworth has testified at two separate hearings before ALJs. Second, as discussed above, ALJ Lisewski failed to provide legally sufficient reasons to reject Drs. Liles, Catlin, and Franklin's opinions and Haynesworth's testimony. *See id.* at 1022.

Third, the Court holds that if ALJ Lisewski credited the evidence and considered it when rendering her opinion, she would be required to find Haynesworth disabled on remand. *See id.* at 1022. As one example of why the improperly discredited evidence would lead to that conclusion, both Dr. Liles and Dr. Catlin determined that Haynesworth's impairments would cause him to miss more than four days of work per month. AR at 447–49. Even otherwise accepting ALJ Lisewski's residual functional capacity assessment—which limited Haynesworth to "simple repetitive tasks in a low-stress environment, with no more than occasional social contact," *id.* at

25—the VE testified that such a person could only miss two days of work per month to be employable. *Id.* at 44–45. The ALJ did not identify and the Court is not aware of any contrary medical or vocational opinion regarding the number of days that Haynesworth would be required to miss from work or whether such absence would preclude employment, and the Court therefore has no "serious doubt as to whether the claimant is, in fact, disabled" on that basis. *See Garrison*, 759 F.3d at 1021.[7] Crediting Drs. Liles, Catlin, and Franklin's remaining opinions, as well as Haynesworth's testimony, only further reinforces the conclusion that Haynesworth could not perform any jobs in the national economy. The requirements for the credit-as-true rule are therefore satisfied, and Haynesworth is entitled to an award of benefits.

## IV.     CONCLUSION

Based on the aforementioned, the Court holds that ALJ Lisewski erred in not finding Haynesworth disabled. The Court remands the matter with instructions to award disability benefits consistent with this order.

**IT IS SO ORDERED.**

Dated: July 31, 2017

_____
JOSEPH C. SPERO
Chief Magistrate Judge

---

[7] Under the statutory framework for disability benefits, not all impairments that prevent a claimant from working necessarily meet the definition of "disability." The law requires that an impairment "has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Dr. Liles and Dr. Catlin's opinions found Haynesworth's impairments would last at least twelve months. AR at 448–49. Crediting those opinions pursuant to Ninth Circuit doctrine, that requirement is therefore satisfied here.